Wind Farm v. Duke Energy. Mr. Parrish. Your Honors, may it please the Court, I'm Ashley Parrish for Benton County Wind Farm. This case arises out of a 20-year contract under which Duke agreed to accept and purchase the power generated by Benton's wind farm at a fixed price regardless of what the market price might be. The central question on appeal here is whether Duke can escape that obligation by deliberately preventing Benton from generating power when, because the market price is too low, Duke does not want to accept and pay for that power. This morning what I'd like to do is try to do three things. First, very briefly explain why Duke's conduct here is a violation of the contract and subverts the entire purpose of a fixed price contract. In fact, Duke has never offered any explanation as to how its interpretation makes any commercial sense or why any rational party would agree to that type of contract. Second, what I'd like to do is address Duke's two main arguments that the contract- You will need to address the question why any rational party would agree to what you say Duke agreed to, which was to pay an infinite amount of money, right, as much as MISO would conceivably accept for your client's benefit. Well, with respect, Your Honor, I don't think that really is our position. So, and let me break that down in two ways. One is the importance of the liquidated damages provision in the contract. And second, how the market actually works. So let me start with the liquidated damages provision. What the contract says is- I can understand your argument that this is effectively a take-or-pay contract and they had to pay whether they take or not. The reason I ask this question is because your alternative argument is that they had to pay MISO any amount, no matter how high, to make sure that MISO would actually accept the power that your client was generating. So, Your Honor, let me address that because both points get to that point. But maybe it would be helpful for me to start with the way the bid process works. What we are saying is that if they don't choose to pay liquidated damages, and that's important, but if they don't choose to pay liquidated damages, what they need to tell MISO is, from our perspective, that they are willing to pay whatever the market price might be. That does not mean that they have to pay the maximum. Yeah, well, but the reason I say including infinite is that if I understand what's going on correctly, MISO has concluded that it doesn't have enough transmission capacity in central Indiana to take all the power that's being generated by wind farms. And so it has to curtail. And that is an absolute limit on what it can take. And therefore, it might be that the negative price to inject energy into the grid could be infinite. It will be as high as necessary to make sure that the grid doesn't overload. That is right, Your Honor. But the point of the fixed price contract is that whatever you bid is set. What ends up happening is the party's bid, and it takes the highest bid of whatever amount clears. So they take as much energy as they can, and then the highest bid that clears. And what we're saying is that by agreeing under the contract to pay whatever the market price would be, that Duke was essentially in a position, it didn't matter whether the market price was low or not. Is your client the only wind farm with which anyone has a similar contract? If the problem is that there's too much wind energy being generated for the size of the transmission capacity, no, you can't have every wind farm making the same claim, because then it's a claim that there's an absolute right to inject into the grid more power than the grid can handle. With respect, no, that's not right, Your Honor. And let me explain why that is, because obviously it's not just wind farms that are putting energy onto the grid. The point is that it isn't a question of how much energy or right to inject energy on the wind farm. In fact, we don't even care what Duke does with the power. We don't mind whether Duke doesn't actually have to sell it to MISO. Duke could keep it itself, pay for transmission service, and use it to serve its customers. It could also, under the contract, the problem about congestion on the contract has to do in part because there isn't sufficient transmission service. But the contract in 6.4 is very clear that Duke has the obligation to secure transmission service. But, Your Honor, if I could, I do want to emphasize the liquidated damage point because it explains how these contracts work, which is that you negotiate a liquidated damages here. Liquidated damages equals the contract price plus the credits. And every rational bidder, whether it would be a wind farm just bidding on itself or whether it would have been Duke, who's now in the position of the wind farm, the negative bid that you would bid up to is the value of the tax credits. And after that point, you would never pay for more because the only rational bidder would be the difference of the tax credits. And so our point, Your Honor, is that nothing in the market changed from the time that Duke entered into the contract where we allocated the risks and when the market became – there became more congestion. You lose me on that. What changed is that much more wind capacity was built until it outstripped the power of the grid to take all – outstripped the ability of the grid to take all the power. Absolutely. Do you know, by the way, what time window we're looking at before more transmission capacity is available? Well, so in answer to your second question, Your Honor, we've already on our own initiative made investments to upgrade the grid, but it's not clear how that will play out. But with respect, Your Honor, in the sense that I just don't know how the capacity – To go back to a case that was argued in this court last month, do you have a right of first refusal to add the transmission capacity? Your Honor, I'm aware of those cases, but I wouldn't dare go into the murkiness of them. Let me say, though, Your Honor, that with respect, that isn't a change that happened under the contract. The parties knew very well, and the reason you have a fixed price contract is that the parties recognize that congestion could be a problem. When Duke solicited this contract, it knew very well that what it wanted to do was hedge against environmental risk, and it wanted to hedge against high prices. Now, it could be that – we know how energy markets have changed so significantly over the last couple of years. All Duke is doing right now is saying we don't want to take the downside of the contract. But if the prices go up, it is quite willing to take all the upside. And the whole point of a fixed price contract, and Your Honor's decision in the NIPSCO case I think makes this point very well, is that regardless of what happens in terms of either the market or in terms of what happens in terms of government regulation, the parties in a fixed price contract are allocating risk. And the risk for our benefit was that we would get a reliable stream of income so that we would be able to get the investment that we needed, which is why we responded to Duke's solicitation. On Duke's side, it got the upsides of hedging against environmental risk. It got the upsides of experience of dealing with a wind farm. And it got the upsides of any market prices that went through the roof. Now, Your Honor, if I could, go back to my sort of first point. If you take a look at the contract, it's very clear that we're right. Paul, could you get me a glass of water, please? So in the contract itself, the first provisions that we focus on are 4.1 and 4.6, which says that Duke must accept the output of the wind farm or pay liquidated damages. There are second provisions, thank you, that say that Duke has no ability to curtail our output. And there's a third provision that says whatever the force majeure events that the parties have agreed to, the one thing that cannot be a force majeure event is a change in economic circumstances that changed the market price. But if you look at what Duke has done, it has violated the letter and spirit of all of those provisions. It has not accepted the energy that we're willing and prepared to deliver. And the only reason we can't do that is because of Duke's conduct. It has done that by taking advantage of a change in market rules to curtail us so that we can't generate the power that we are ready and willing to generate. And it has done it precisely because there has been a change in market circumstances that mean that the market prices, it doesn't want to pay for the low sides anymore. But all of that is completely in violation of the essence of what the contract is about. And, you know, Judge Easterbrook. Well, what do you mean when you say it doesn't want to pay the low sides? You mean the liquidated damages? Well, yes, Your Honor. I guess the way I would put it to be precise is that our position is that they need to tell MISO when they bid into the market that regardless of what the market price might be, that they are prepared to take our power at that price. Or they can pay liquidated damages. And I'm sort of generalizing here. Well, are the liquidated damages the same as that high price? They are not, Your Honor. What the liquidated damages are is they are the contract price plus the tax credits. The contract price washes out. So the rational thing that you look at is the tax credits. I'm not going to be exact on this, but the tax credits is about, say, like $40, $35. The rational bid, and this is what the wind farms do, is they bid minus $35. Because they know that if the price drops to anything less than minus $35, they take the credits. And so the reason why I was having my exchange with Judge Easterbrook is because this idea of the maximum negative price doesn't actually work in the sense that the contract actually minimized that risk by having the liquidated damages provision. But what they're trying essentially to do here is change it. So instead of saying the liquidated damages is that minus $35 or thereabout price, they're changing it unilaterally by taking advantage of their ability to bid to say, well, we don't want to pay for prices that are negative like that. We'll only pay for a higher price. And the whole point of the idea that they were going to take our generation, no matter what happened, was that even if prices dip for a time, that would be on them, not on us. And what's happened is that they've shifted the risk. So now we are being pushed to a point of insolvency because right now the prices are low. We're bearing all that risk, even though the whole point of the contract was to even out our risk by giving us an assured contract payments. Your Honors, if you take a look at Duke's arguments. Do you have any problem with MISO? Do you regard MISO as implicated in some way in Duke's conduct? No, we don't have a problem with MISO, Your Honor. The way we would put it is that, and we use the example in our brief of somebody who builds a gate. If the buyer is a gate across the road so you can't deliver potatoes to a buyer, if someone else is telling that person when to close the gate, it's that person who's responsible. What's happening here is MISO is doing predictably what it would do based on Duke's bids. Duke has all the ability to tell MISO when we can run by putting in a bid that will say to MISO, we will comply with the contract no matter what the market price is. We are taking this power. What Duke is doing is it's using MISO in a way to interfere with our ability to perform the contract. So one of the key arguments in the case is whether or not we have to. But when you say it's using MISO, could MISO prevent this use, this improper use? Well, Your Honor, I wouldn't think about it that way. So the way I would think about it is that before the rule change, all that happened was that we were designated as a must-run facility, which meant that no matter what was going on, Duke would just take our power and the market price would be what it is. When MISO changed the rules, it allowed Duke to say when it wants to take the power by putting in a bid. And if that bid clears, then they take the power, and if it doesn't, they don't. So essentially, using that new mechanism, Duke could bid as high as it would like to, and in doing so basically indicate to MISO that it isn't willing to take the power once it drops below that price. That's why in Duke's brief, Your Honor, I think has hit upon one of Duke's main arguments, which is this is MISO's fault, not ours. But at the end of the day, it's very predictable. They may not know exactly what the market price will be, and it may not always be the case that MISO follows their instructions exactly because of ramping up and ramping down of the facility, but they do know the relationship with perfect precision, which is that they know that when they bid at a certain level, if the market price drops below that level, that they will not have to pay for the power. And the whole point of the contract was to say that they could not do that. So they basically exercised self-help to take advantage of the change in the market rules to minimize their downside risk. Mr. Mayer, could you speak to Section 6.2 on the reasonableness? Yes. So, Your Honor, I'd say a few things about that. The first thing we'd say is that whatever reasonableness requirement is included in a contract, we know from basic contracting principles that preventing another party from performing is not itself reasonable. But also, Your Honor, if you take a look at Section 6.3, which is the next section, it goes on to say that nothing in Section 6.2 shall, and let me see if I can read the exact language, but essentially nothing in 6.2 will result in a curtailment of the wind farm. That is reinforced by the Section 2.4 in the Separate Joint Operating Agreement, which is very specific, that says Duke cannot curtail. And so what we would say is that however you interpret the reasonable requirement, it cannot be interpreted in a way that would prevent us from generating power and allow Duke to avoid accepting power that we're prepared to deliver. One of the reasons is, Your Honor, is that when this contract was negotiated, there wasn't the ability to bid in the way that they can bid now. And so it is true that things change, and parties cannot always anticipate how things will change, but the essence of the contract doesn't have to change, which is that the market risk will remain where it remains and was allocated under the contract. That I take to be the point of the Court's decision in its NIPSCO case, which is that yes, it is true that regulations can change. Yes, it is true that market conditions can change, but the point of the fixed-price contract is to make those changes largely irrelevant. And I think, if I may, going back to Judge Posner's question here about MISO, it is telling that Duke's defense here of why they're doing this is because they think they're helping their customers out. Of course, that, in our mind, just shows the fact that they recognize that there is this relationship. And, of course, the contract was approved by the regulators on the understanding that prices could go down. Your Honors, I see that my white light is on. I would like to save some time for rebuttals if there's no more questions. Thank you very much. Thank you. Mr. Parrish. Mr. Popper-George? Yes, good morning. May it please the Court. Duke Energy is not shifting the burden to Benton County, and Duke Energy is not— Well, what would be an example of circumstances in which you would acknowledge that you would be required to pay the liquidated damages? One example, Your Honor, would be a situation where Duke Energy did not obtain transmission services. If you read the language of Section 4.6, it talks about Duke, in the event they fail to accept power by failing to obtain transmission services. There are a series of defenses that Duke could use, emergency condition, force majeure that are not at play here today. But what Benton County continues to ignore is that there is only one exception where Duke could fail to accept power, and that would be by failing to obtain transmission services under 6.4. What Benton is arguing and what they are suggesting is, is that under 4.6, the liquidated damages clause, Duke is obligated to guarantee delivery of every single megawatt that Benton could possibly deliver. Under any plain reading of 4.6, liquidated damages clause, you can't read it that way. You have to look at failure to accept, and you have to look at transmission services. Then you move over to Section 6.4, and the very first sentence of that paragraph is dispositive of this issue. Back in 2006, when the parties signed this contract, Duke told Benton that they did not intend to use transmission services, number one. Number two, that they intended to deliver the power that was purchased at the meter point and measured and deliver that to the grid or to MISO to the grid. What do you mean by transmission services? Transmission services allow for the power to move through the grid. In this case, the turbines, the wind farm turbines off of US-41 in Benton County, are about five miles from the meter point. The power travels to the meter point, and then transmission services would be an example of where Duke potentially, although not required, other utilities can move the power away from the meter point by additional transmission service, additional lines. Here, in this case, the power moved directly to the grid and to MISO at that meter point, so there was no need to utilize transmission services. And Benton knew that from the beginning and agreed to that. Now, Benton has continued to focus on the language a little bit later in the paragraph where it says, well, Duke is required to obtain transmission services. That is not true. There is no evidence in the record that MISO ever required Duke to obtain transmission services. In fact, MISO has taken the power at the meter point. So when you analyze transmission services and you analyze Section 4.6, this liquidated damage issue is right for summary judgment, which is what Judge Barker did. One more point on transmission services. Benton's own expert testified that if Duke is going to accept the power at the meter point, it does not need to obtain transmission services. That's Benton's own admission. I don't know. What are transmission services? They're basically transmission lines. They're the ability to move power through the grid. And so if you're driving down the road, you'll have power lines. Those essentially are transmission services. It's capacity. It's the ability to move through. Well, what is at that metering point? It is a transmission line, essentially, where the power is measured and then goes out into the grid. This power is in northwest Indiana, and it moves out into Illinois through the lines that you see on the road. So what's the difference between those transmission lines and what you're calling transmission services? It's essentially the same thing, Your Honor. And Benton County wants Duke to pay hundreds of millions of dollars to create its own separate set of services and move the power elsewhere. And it's not required to do that. It's required under the contract. Well, we're not talking about construction. We're just talking about payment of liquidated damages. But the payment of liquidated damages, Duke is not obligated to pay any of those liquidated damages because it hasn't failed to accept any power. And the reason why it hasn't failed to accept power is because the only way it can fail to accept is if it doesn't obtain transmission services. So, for example, let's say MISO told Duke, we're not going to take the power at this point. We want you to move it somewhere else. And Duke says, we don't want to do that. Well, then Benton would not be able to deliver the power at that point because MISO wouldn't let them. That is a situation where Benton could come to Duke and say, you owe liquidated damages because you won't move the power elsewhere. That is not our case. There is no fact. I don't understand the difference. Four points. What's the point? The point is... So if you think about the negotiation leading to the liquidated damages clause, why would you be pushing for this exception? Why would Benton go along with it? It seems so, I don't know, artificial. Transmission services versus the metering point. What has that to do with the risks to Benton and to Duke? Because the parties agreed to the contractual language. I want to see the logic behind this. What is the practical consideration that would lead to a different rule about liquidated damages depending on whether there is one kind of transmission line or another kind or another location of transmission line? The logic behind the contract was that Duke Energy was going to purchase power delivered by Benton County subject to MISO's dispatch. And as long as MISO is dispatching that power, Benton is able to deliver that power. And everybody gets along fine. Where Benton is complaining and what they're upset about is they're arguing that we are not accepting all of the power that they could generate. Duke is not obligated to accept that power that they cannot generate unless... So is this liquidated damages clause just a phony? No, no. It's not... You would always be able to get out of it? No, because if we did not obtain... If MISO told Duke, you have to move the power away from this meter point and send it somewhere else. Why should it matter whether it's the meter point or somewhere else? Because that's what the contract... But why? Because that's what the parties agreed to. But why? There has to be a reason for an agreement, doesn't there? There does. And the reason behind the agreement was that Benton would generate power, deliver it to this point where it has to be measured, and then it would be delivered to the grid. The point of the wind power was to deliver clean energy to the grid. And this was the mechanism that the parties agreed to. Generate, deliver, measure, goes out into the grid. That was what the parties agreed to. The parties also agreed that they would reasonably... But if it goes to other transmission lines, it's still going to be going into the grid. In a different place. So what? Well, potentially you could avoid some congestion, although there's nothing in the record that would suggest by moving the transmission services you could avoid congestion. So it sounds like there's nothing involved. I don't get it. There is a reason why... What is the reason? The reason is to allow the parties to agree to a situation where Duke would have to pay the liquidated damages. But there's only one exception that the parties agreed to. And that is Duke's failure to obtain additional transmission services or to move the power elsewhere. And there has been no example of that. There has been no requirement of that. I mean, the parties agreed on one situation where liquidated damages would be... So you're saying Benton must have been really stupid because they agreed to something where Duke can screw them. I'm not saying they're completely stupid, but what I would say is... Well, but that's your argument. What I would say is this. Duke can... No, no. If Duke... If Benton County, its business model depended upon the delivery of all of the power that it could possibly generate, Benton should have entered into a contract where Duke is required to buy a minimum amount or pay a certain amount. And that's not what this language requires. This is an exception involves transmission services. Yeah, I just wish you had a reason for it. Well, I do because the reason is that where MISO may require Duke to move the power elsewhere. That's the reason. And MISO has never required that. What MISO does is it takes the power that Duke sells to it. And that's the system. That's this electrical... That's how this process was set up. So there is an absolute legitimate reason why the liquidated damages provision is present. It's just that there has been no facts presented by Benton that would establish... Why would you agree when you have this tremendous exception that can easily ruin you? What's its motive? Its motive is to deliver the power that Duke purchases. I know, but Duke or MISO or what have you, they can destroy Benton. No, they're not destroying Benton. They're not attempting to destroy Benton. Well, I think they are destroying Benton. He said they're sinking into insolvency. That's destruction. MISO is dispatching the wind farm when Duke submits its offer price 59% of the time. This power is getting generated and delivered. Is it as much as Benton would like? No. But again, Benton should have... Well, how much is it relative to what they delivered before? There is no evidence in the record. I don't know the answer to that question because there's no evidence in the record of what percentage Benton was dispatched prior to the rule change. We do know that in 2010, 11, and 12, MISO was issuing significant curtailments by phone because of the congestion that Judge Easterbrook talked about. The reason why the MISO moved to the rule change was because the congestion was significant. No, I understand. There's nothing wrong with reducing with adjustments by MISO that result in Benton not being able to transmit as much energy. But I thought Benton was protecting itself with a liquidated damages clause. It turns out liquidated damages clause is totally empty. It's not empty. It's just there's no facts that Benton can present where they would be entitled to the liquidated damages. It is a very legitimate provision with a place. And the reason is that if... It goes into one line, but if it doesn't, it goes into a different line. Benton is at your mercy. Is there some economic reason for that? It is the agreement that the parties signed. Yes, I know, but I assume that these agreements have some purpose. They're not just tricks. No, no, the purpose was for... Why would they care? Why would Benton care? Why would anyone care about having a liquidated damages clause which would be worthless if there was some shift in, you know, where the energy was picked up? Your Honor, Benton has also argued that Duke has not reasonably cooperated by submitting its offer price. And they've attempted to take the reasonable cooperation language and argue that we are failing to guarantee delivery of power. And so potentially, although they haven't specifically argued that failure to accept equates reasonable cooperation, I think one can assume that Benton is saying, well, you should be offering a maximum negative price to guarantee delivery. And by not doing so, you're failing to accept.  In fact, what Duke is doing is submitting an offer price that takes into consideration a variety of interests, including Benton's own interest. Benton's expert testified that the contract price would be reasonable offer to MISO if this is not a take-or-pay contract. And it is clear that this is not a take-or-pay contract. So when you look at the undisputed facts that the district court considered and you look at Duke's actions, it is much more reasonable than what even Benton's own expert testified. Duke takes into consideration its customers, takes into consideration the IURC order, which requires that Duke pay the lowest reasonable costs possible. That's what the IURC requires. So Duke has consistently submitted its offer price. The answer to not using MISO, the issue that Benton raised, MISO is the independent third party. It uses a complex algorithm to take into the price, factors in congestion, demand, a variety of other issues, and then it decides whether the power is dispatched at that price. Benton's own expert admitted that it's difficult. What's your conception of the meaning of the term electrical output? Electrical output is defined as power that is delivered to the point of meter. And that's what Duke has been paying is the electrical output after the MISO clears its offer price. And MISO's offer price is part of the algorithm. MISO has been dispatching 59 percent of the time. And as a result, Duke is by definition reasonably cooperating by submitting the price that it has been submitting. It is not a guarantor. I see that my one minute. It is not the guarantor of this project. The parties agreed in an arm's length deal that Duke would purchase power delivered. There is no dispute that they have done that. And the idea that a MISO dispatch down signal is a failure to accept cannot be read by the plain meaning of this contract. Duke is not hiding behind MISO. They're not attempting to use MISO to do anything other than sell power into the grid, which is what it has done. And the difficulty of predicting what offer is compounded by the fact that MISO, even at times, has dispatched this plant, this wind farm down, even when the price has been above zero. Benton wants Duke to submit the maximum negative price. But this contract says reasonably cooperate with each other. And in order for. What does Section 6.3 mean when it says nothing in Section 6.2 or this Section 6.3 shall require a seller, I assume that's Benton, to take any action affecting or which would otherwise result in any reduction in the electrical output? What does that mean? Your Honor, Section 6.3, that's a very good question. It certainly does not. That section does not impose any duty upon Duke. The title of the section, I believe, is Environmental Quality Certification Requirements. And it just it says simply that nothing in 6.2 shall require to take a seller to take any action that would result in electrical output. And certainly Duke is not taking any action that would result in a reduction in output. What Duke is doing is complying with Section 6.2. It is submitting the offer price after balancing, including Benton's interests. If Duke was truly avoiding Benton's interest, it would be offering the contract price to MISO. And it doesn't do that. It is offering its reasonable price. And as a result of MISO's... But what's happened to Benton and its output? At times, Benton output is not dispatched by MISO. And at times, Benton output is dispatched. Well, how much has its output fallen? We do not have a percentage of output falling. We do know that it is currently dispatched 59% of the time. There's no evidence in the record of a before or after. So we have a 59% current number. And one more point on that, Your Honor, is that when MISO... There are times when MISO will dispatch the wind farm when the price is below Duke's offer, which means that Duke ends up paying the negative costs to MISO. And Duke has paid almost $700,000 in those negative costs, which have been audited and which Duke has to submit to the IURC to obtain approval for those. And so as a result, MISO is dispatching. There are times when MISO doesn't dispatch. But at the end of the day, Duke is reasonably cooperating. It is not required to obtain transmission services. And it has not failed to accept any power. So as a result, we would request that this court affirm the district court. Okay. Well, thank you, Mr. Papagiorg. And Mr. Parrish? Your Honor, if I may, let me just say three points and then wrap up. First, we are not saying that Duke must guarantee that we can generate. What we are saying is that Duke cannot prevent us from generating. Your Honor, in response to your questions, their bidding has reduced our production or output by 50%. That's a finding by the district court on SA-27 of the supplemental appendix. Second, there is no logic behind their position at all. They cannot distinguish the situation between when they exercise self-help by bidding and saying we're not prepared to pay the market price from a situation where they come in and cut the lines. Obviously, the contract has to prevent situations where a party frustrates the other party's side to perform. Their whole argument, my friend's whole argument, depends on this idea that there's a difference between generation and delivery. But as a matter of physics, that makes no sense. The whole way that this works is that as soon as we generate because of the way that electrons move at the speed of light, the energy goes onto the grid. And so this idea that there is a separate obligation for us to deliver doesn't work. And also you'll notice that nowhere in their briefing or in the argument today or in the district court have they pointed to anything that has prevented us from delivering the power to the point of meeting except the fact that we're getting a dispatch down single that is a direct, predictable, and obvious result of the fact that Duke is telling MISO that it is no longer willing to take our power when prices are lower than it would like to pay. They also have failed to obtain transmission service. I don't think the court needs to get into this complexity, but if you take a look at Section 6.4 of the contract, what it says is that they need to obtain transmission services necessary to accept the power at the point of metering, including transmission services necessary to deal with congestion. Judge Easterbrook, this takes us back to your original question, that although, yes, we have put money in because we want to survive, we want to relieve the transmission, the contract is clear that the party that has that obligation is Duke. It isn't that Duke has to get transmission services. We don't care what Duke does under the contract, but Duke has to accept our power, and it can't use its excuse of not taking transmission services as a reason for not being able to accept it. So there's lots of things Duke could do under the contract to live up to its contractual obligations. We don't care what they are, whether it's taking transmission services, whether it's designating us as must-run, whether it's paying us liquidated damages, or whether it's bidding at a significant low enough level that their bid will clear. Any one of those things are sufficient, but they have to do it to comply. Your Honors, let me just finish up by emphasizing, looking at whether the contract makes sense. If you interpret the contract the way we would like it interpreted, it puts the parties in the same position they were when they negotiated the contract. We get nothing more or less than what we negotiated, which is the contract price when we can generate power for reasons that have nothing to do with Duke. So as long as the wind blows, we're generating our power. Duke is in no worse position. All it has done is taken on the market risk. If prices go back up, Duke will be singing Hallelujah. It will be doing very well, thank you very much. And when prices stay low, then it takes that risk. But that was the risk that was assigned. If you interpret the contract the way Duke wants you to interpret it, it makes no sense at all because essentially, other than their argument that they have to be reasonable, there is no limit at all as to what market price they can force us to shut down, which essentially means that the contract, instead of being a fixed-price contract that allocates risk, it shifts all the risks or the downside risks to Benton. It drives us out of business, and it gives them the windfall that they want. But why do we have this reasonableness section 6-2 in the contract? If it's as simple and direct, Mr. Parrish, respectfully, as you just laid it out, shouldn't that have been the contract condition? Well, Your Honor, I guess I would say a few things. One is that both the district court and Duke are putting a lot of emphasis on that reasonableness language, which is one provision of the contract. But it does money up the contract, doesn't it, the reasonableness? I don't think so, Your Honor, because I think it is true that both parties have to cooperate and act reasonably. At the time we negotiated the contract, that reasonable bid requirement had a very different meaning because there wasn't the ability for Duke to bid. So in some ways, it was as much for Benton's benefit as it was for theirs. It's only because of the changed circumstances. And the one thing the courts always do is they recognize that whether you're interpreting a statute or whether you're interpreting a contract, it is always possible in retrospect to come up with some clever argument as to why it can be circumvented. But we have these background principles that say, no, you can't circumvent the contract. It is odd to put all this emphasis on reasonable bidding, where 6.3 specifically says that that cannot be a basis for curtailing. And then you undermine the rest of the contract, which is it's no longer a fixed-price contract. It's just a one-sided contract that allows for— Yeah, but the contract allowed for delegating to Duke the bidding, right? Absolutely, Your Honor. But that is because the whole point is that they solicit the bid for a wind farm. And the risk we took was to operate the wind farm, make sure that if lightning strikes, that's on us. Their job is to buy the power no matter what the price would be. Your Honors, I appreciate your time. And let me just ask you that you reverse the district court and direct entry of summary judgment in our favor. Thank you very much. Okay. Thank you very much, Mr. Parrish, Mr. Poppe, George.